**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

Mahmood Abdulle Ahmed,

          Petitioner,

v.

Joel Brott, Sheriff of Sherburne County; and
Scott Baniecke, Field Office Director, ICE ERO,

          Respondents.

Civ. No. 14-5000 (DSD/BRT)

**REPORT AND
RECOMMENDATION**

Mahmood Abdulle Ahmed, Sherburne County Jail, 13880 Business Center Dr. NW, Elk River, MN 55330, *pro se* Petitioner.

Ana H. Voss, D. Gerald Wilhelm, and Bahram Samie, United States Attorney's Office, counsel for Respondents.

BECKY R. THORSON, United States Magistrate Judge.

      Mahmood Abdulle Ahmed, a Somali national awaiting removal to his native country, has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241, claiming that his continued administrative detention is unlawful under *Zadvydas v. Davis*, 533 U.S. 678 (2001), and that he is therefore entitled to immediate release from custody. (Doc. No. 1.) The government opposes the petition, contending that immediate release is not required under *Zadvydas* because there is a significant likelihood that Ahmed will be removed to Somalia in the reasonably foreseeable future. (Doc. No. 4 at 1, 8–11; *see also* Doc. No. 12.) Because Ahmed has not, at this time and in light of the current record,

1

stated a viable *Zadvydas* claim for release from detention, this Court recommends that his petition be denied without prejudice.

## I.  BACKGROUND

Ahmed, a native and citizen of Somalia, entered the United States as a refugee on August 16, 2000, and later adjusted his status to that of lawful permanent resident. (*See* Doc. No. 6, Decl. of Jorge Tenarodriguez ("Tenarodriguez Decl.") ¶ 4; Doc. No. 8, Ex. 2 at 2; Doc. No. 8, Ex. 3 at 1.) Thirteen years after his arrival, Ahmed was convicted in Minnesota of stalking with intent to injure, a gross misdemeanor for which he was sentenced on December 20, 2013, to one year in prison. (*See* Doc. No. 8, Ex. 1 at 1–2; Tenarodriguez Decl. ¶ 5.) Based on that conviction, Ahmed was immediately taken into the custody of U.S. Immigration and Customs Enforcement ("ICE") and charged with being removable under 8 U.S.C. § 1227(a)(2)(A)(iii) for having been convicted of an aggravated felony. (*See* Tenarodriguez Decl. ¶ 5; Doc. No. 8, Ex. 2 at 2–4; Doc. No. 8, Ex. 3 at 1); 8 U.S.C. § 1101(a)(43)(F) (defining "aggravated felony" as, among other things, "a crime of violence . . . for which the term of imprisonment [is] at least one year"). Over Ahmed's objections, an immigration judge ("IJ") sustained the charge of removability on February 3, 2014, finding that Ahmed's conviction for stalking with intent to injure constituted an aggravated felony. (Doc. No. 1, Attach. 1 at 5–7.) Four months later, on June 12, 2014, the IJ denied Ahmed's applications for asylum, withholding of removal, and relief under the United Nations Convention Against Torture, and ordered his removal to Somalia. (*Id.* at 8–17.) Ahmed's order of removal became final five days later, on June 17, 2014, when he formally waived his right to appeal the

IJ's decision to the Board of Immigration Appeals.[1] (*See* Doc. No. 8, Ex. 5); 8 C.F.R. § 1003.39 ("[T]he decision of the Immigration Judge becomes final upon waiver of appeal or upon expiration of the time to appeal if no appeal is taken whichever occurs first.").

Within two weeks of the final order of removal, ICE issued a warrant for Ahmed's removal and initiated the process of securing a travel document from the Somali government that would permit his return via commercial flight. (*See* Tenarodriguez Decl. ¶¶ 8–9; Doc. No. 1, Attach. at 1; Doc. No. 8, Ex. 6.) Those initial attempts at removal were stalled by the Somali government's request that ICE suspend all deportations during the Muslim holy month of Ramadan, which lasted from approximately June 28 through July 28, 2014. (*See* Tenarodriguez Decl. ¶ 9.) On August 19, 2014, once Ramadan had ended, the Somali government authorized Ahmed's removal and issued him a travel document valid from September 11 through September 25, 2014. (*See id.* ¶ 10; Doc. No. 8, Ex. 7.) While awaiting Ahmed's anticipated removal, ICE conducted a required 90-day review of his detention on September 8, 2014, and concluded that further detention was warranted because Ahmed posed "a threat to the community" and his "removal from the United States [was] reasonably foreseeable in the near future." (Doc.

---

[1] In his petition, Ahmed asserts that his removal order became final on June 14, 2014, when the IJ purportedly issued his decision. (Doc. No. 1 at 1.) The record reflects, however, that the removal order was actually issued on June 12, 2014. (Doc. No. 1, Attach. 1 at 8.) Moreover, the order did not become administratively final as of the date it was issued; rather, it became final five days later when Ahmed waived his right to appeal. *See* 8 C.F.R. § 1003.39.

No. 8, Ex. 8); *see* 8 C.F.R. § 241.4(k) (requiring a custody review before expiration of the general 90-day removal period).

The government's plans for imminent removal were again stymied on September 17, 2014, when the Somali government rescinded Ahmed's removal authorization and requested a meeting with ICE to clarify the procedures for all Somali removals going forward. (*See* Tenarodriguez Decl. ¶¶ 12–13.) Representatives of ICE later met with Somalia's Ministry of National Security and, based on those discussions, the Somali government approved the removal of certain Somali nationals, including Ahmed. (*Id.* ¶ 13.) By that time, however, Ahmed's previously issued travel document had expired. Thus, on December 12, 2014, ICE secured Ahmed's cooperation in applying for a new travel document from the Somali government. (Doc. No. 1 at 7.) When ICE reviewed Ahmed's custody status for a second time on December 16, 2014, it again decided to continue his detention because it was "currently working with the government of Somalia to secure a travel document for [his] removal," which was "expected to occur in the reasonably foreseeable future." (Doc. No. 8, Ex. 9.)

The next day — December 17, 2014 — Ahmed filed his habeas petition, seeking immediate release from detention under *Zadvydas* because "his removal to Somalia is not reasonably foreseeable." (Doc. No. 1 at 1.) The government responded to the petition on January 20, 2015, arguing that it should be denied because Ahmed had not met his initial burden of showing no significant likelihood of removal in the reasonably foreseeable future and, even if he had, that there was a substantial likelihood of removal within sixty days. (Doc. No. 4 at 6–11.) In support, the government submitted a declaration from ICE

4

Detention and Deportation Officer Jorge Tenarodriguez, dated January 15, 2015, who explained that "ICE has initiated the process towards having the [Somali government] reissue Ahmed's travel document, with the expectation that [he] will be removed to Somalia within the next sixty (60) days." (Tenarodriguez Decl. ¶ 14.)

Since that time, and during the pendency of these proceedings, the Somali government issued a second travel document for Ahmed on February 17, 2015, and his removal was scheduled for five days later. (Doc. No. 13, Second Decl. of Jorge Tenarodriguez ("Second Tenarodriguez Decl.") ¶ 5.) On February 21, 2015, however, Ahmed's removal was again canceled after Somali officials unexpectedly denied him entry into the country. (*Id.*; *see also* Doc. No. 12 at 1.) According to an updated declaration from Deportation Officer Tenarodriguez, submitted by the government on March 12, 2015, ICE has learned from the U.S. State Department that the denial of entry was driven by a recent change in the composition of the Somali Cabinet, which apparently needs to be briefed on removal procedures for Somali nationals. (Second Tenarodriguez Decl. ¶ 5.) Tenarodriguez states that the State Department's Somali Desk Officer, in coordination with ICE's Assistant Attaché in Africa, has since "initiated direct communication to brief the necessary Somali officials" on those repatriation procedures, and that he is "not aware of any further impediments to Ahmed's removal." (*Id.* ¶¶ 6–7.) Given the apparent lack of such impediments, coupled with the fact that the Somalia has twice issued a travel document for Ahmed, the government maintains that "there is sufficient reason to believe that removal is significantly likely to occur in the reasonably foreseeable future." (Doc. No. 12 at 1–2.)

5

## II. ANALYSIS

Pursuant to 8 U.S.C. § 1231, the government ordinarily must secure an alien's deportation within a 90-day "removal period," during which the alien must be detained. 8 U.S.C. § 1231(a)(1)-(2). That 90-day removal period, however, does not actually begin to run when an immigration judge orders removal; instead, it starts on the latest of three possible dates:

> (i) The date the order of removal becomes administratively final.
>
> (ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.
>
> (iii) If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

*Id.* § 1231(a)(1)(B). For certain classes of removable aliens, including those who have been convicted of an aggravated felony or who have otherwise "been determined by the Attorney General to be a risk to the community," the government may extend their detention beyond the initial 90-day removal period. *Id.* § 1231(a)(6).

Because the language of § 1231(a)(6) ostensibly authorizes indefinite and potentially permanent detention, thereby raising serious due process concerns, the Supreme Court in *Zadvydas* construed the statute to implicitly limit "an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States." 533 U.S. at 689–90. To assist lower courts in making that determination, the Court held that it is presumptively reasonable for the government to detain an alien for six months after the statutory removal period has begun. *Id.* at 701. After that six-month period has expired, an alien may seek his conditional release by

6

providing "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," which then requires the government to "respond with evidence sufficient to rebut that showing." *Id.* The longer the alien's post-removal detention, the easier it is for him to satisfy his initial burden (and the harder it is for the government to rebut that showing) because "what counts as the 'reasonably foreseeable future'" shrinks as the "period of prior postremoval confinement grows." *Id.* The Supreme Court's decision in *Zadvydas* nonetheless emphasized that "an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.*

At the time Ahmed filed his § 2241 petition on December 17, 2014, six months (or more precisely, 183 days) had elapsed since his order of removal became final on June 17, 2014. At present, Ahmed has been in post-removal detention for nine months. While the time of filing generally controls the analysis of *Zadvydas* claims, such that a petition filed before the expiration of the presumptively reasonable six-month period is either premature or fails to state a viable claim for release,[2] this Court need not decide

---

[2] *See, e.g.*, *Akinwale v. Ashcroft*, 287 F.3d 1050, 1052 (11th Cir. 2002) (holding that the presumptively reasonable six-month period "must have expired at the time [the alien's] § 2241 petition was filed in order to state a claim under *Zadvydas*"); *Mehighlovesky v. U.S. Dep't of Homeland Sec.*, No. 12-902, 2012 WL 6878901, at *2 (D. Minn. Dec. 7, 2012) (explaining that "an action that presents a *Zadvydas* claim will be dismissed as premature, if the action was commenced less than six months after the apposite removal order became final" and even when "post-removal-order detention has exceeded six months by the time the case is decided"); *Keita v. Sabol*, No. 1:CV-11-248, 2011 WL 1375052, at *2 (M.D. Pa. Apr. 12, 2011) ("A petition filed before the expiration date of the presumptively reasonable six months of detention is properly dismissed as premature."); *Ba v. Gonzales*, No. 4:07cv307, 2008 WL 2157073, at *2

(Footnote Continued on Next Page)

whether Ahmed's petition was filed before or after that period had expired.[3] Nor does this Court have to decide whether Ahmed has met his initial burden of showing a "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Zadvydas*, 533 U.S. at 701; *see also Akinwale*, 287 F.3d at 1052 ("[I]n order to state a claim under *Zadvydas* the alien not only must show post-removal order detention in excess of six months but also must provide evidence of a good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable

---

(Footnote Continued from Previous Page)
(N.D. Fla. May 19, 2008) ("It is not enough that [the six-month] period of time expired by the time the petition is ruled on [] by the court, the *Zadvydas* period must have expired before the petition is filed."); *Fahim v. Ashcroft*, 227 F. Supp. 2d 1359, 1363 (N.D. Ga. 2002) ("A six-month custodial period of time following the order of removal must have elapsed prior to the filing of a habeas petition challenging confinement under *Zadvydas*.").

[3]     In *Zadvydas*, the Supreme Court spoke only of a presumptively reasonable detention period of "six months." *See* 533 U.S. at 701. Although six months may or may not equal 180 days depending on the specific months in question, a number of courts have narrowly construed *Zadvydas*' presumptively reasonable period as equaling that many days. *See Akinwale*, 287 F.3d at 1052 (interpreting the six-month period "to include the 90-day removal period plus 90 days thereafter"); *see also Am. Civil Liberties Union v. U.S. Dep't of Homeland Sec.*, 973 F. Supp. 2d 306, 313 (S.D.N.Y. 2013); *Rennie v. Baniecke*, No. 11-2970, 2012 WL 2003575, at *2 (D. Minn. May 15, 2012); *Karim v. Cabral*, No. 07-10139, 2007 WL 2746797, at *2 (D. Mass. Sept. 12, 2007); *Kazarov v. Achim*, No. 02 C 5097, 2007 WL 647453, at *10 (N.D. Ill. Feb. 27, 2007). The Eighth Circuit has yet to weigh in on this issue, observing only that "[i]t is presumptively reasonable for the government to detain the alien for six months or less." *Bah v. Cangemi*, 548 F.3d 680, 683 (8th Cir. 2008). Ahmed's petition was filed six months to the day after his removal period became final, though given the specific months in question, his post-removal detention had actually lasted 183 days by that time. For the reasons stated herein, this Court need not decide whether the *Zadvydas* period is tantamount to 180 days (in which case Ahmed's claim would be ripe for review) or six months, as measured from a specific day on each month without regard to the total number of days that have elapsed (in which case Ahmed's claim would necessarily fail).

future."); *Andrade v. Gonzales*, 459 F.3d 538, 543 (5th Cir. 2006) ("The alien bears the initial burden of proof in showing that no such likelihood of removal exists."). For even if both are assumed, Ahmed would still not be entitled to immediate release under *Zadvydas* because the record currently does not establish that he faces no significant likelihood of removal in the reasonably foreseeable future, such that his detention may be indefinite or potentially permanent.

Courts have found no significant likelihood of removal in five types of cases: (1) where the detainee is stateless and no country will accept him; (2) where the detainee's country of origin refuses to issue a travel document; (3) where there is no repatriation agreement between the detainee's native country and the United States; (4) where political conditions in the country of origin render removal virtually impossible; and (5) where a foreign country's delay in issuing travel documents is so extraordinarily long that the delay itself warrants an inference that the documents will likely never issue.[4] *See, e.g.*, *Jaiteh v. Gonzales*, No. 07-1727, 2008 WL 2097592, at *3 (D. Minn. Apr. 28, 2008) ("Where a foreign country delays issuance of travel documents for an extraordinarily long period, it is possible to infer . . . that the documents will not issue at all, and thus that there is no significant likelihood of removal."); *Jama v. ICE*,

---

[4]  *Zadvydas* involved both a stateless alien born in a displaced persons camp in Germany after World War II and a refuge from Cambodia, which had no repatriation agreement with the United States. *See Zadvydas*, 533 U.S. at 684–85. Even so, the Supreme Court did not actually hold that either alien was due to be released; instead, it remanded their cases for further proceedings and, in so doing, noted that the absence of an existing repatriation agreement must be assessed in light of "the likelihood of successful future negotiations." *Id.* at 702.

9

No. 01-1172, 2005 WL 1205160, at *4 (D. Minn. May 20, 2005) (ordering a detainee's release where even ICE acknowledged that deportation "may well be impossible" given the then-existing political conditions in Somalia); *Nma v. Ridge*, 286 F. Supp. 2d 469, 475 (E.D. Pa. 2003) (recognizing four other types of cases where courts have found no significant likelihood of removal). In other words, for there to be *no* significant likelihood of removal in the foreseeable future, there must be some indication that the government is either unwilling or, due to seemingly insurmountable barriers, incapable of executing an alien's removal. *See Akinwale*, 287 F.3d at 1052 (affirming the dismissal of an alien's § 2241 petition where there were no "facts indicating that the INS is incapable of executing his removal to Nigeria and that his detention will, therefore, be of an indefinite nature"); *Khan v. Fasano*, 194 F. Supp. 2d 1134, 1136–37 (S.D. Cal. 2001) (explaining that an alien's detention may be "indefinite and potentially permanent such that release is warranted" if there are institutional or individual barriers to repatriation) (quotation omitted).

Ahmed's situation does not fall within any of the aforementioned categories, and there is no indication that the government is otherwise unwilling or incapable of effectuating his removal in the reasonably foreseeable future. The record shows that ICE has successfully removed detainees to Somalia on multiple occasions since 2012, that it has twice secured travel documents for Ahmed from the Somali government, and that it is currently working towards having the Somali government issue a third travel document that will authorize his eventual repatriation. (*See* Tenarodriguez Decl. ¶¶ 8–14; Second Tenarodriguez Decl. ¶¶ 5–7; Doc. No. 12.) Where, as here, "ICE has made

10

diligent and reasonable efforts to obtain travel documents," the alien's native country "ordinarily accepts repatriation," and "that country is acting on an application for travel documents," most courts conclude that there is a significant likelihood of removal in the foreseeable future. *Jaiteh*, 2008 WL 2097592, at *3 (collecting cases). Although ICE has certainly encountered some setbacks and delays in its ongoing efforts to remove Ahmed to Somalia, "the reasonableness of detentions pending deportation cannot be divorced from the reality of bureaucratic delays that almost always attend such removals." *Fahim*, 227 F. Supp. 2d at 1367. The delays encountered thus far by the government are not alone sufficient to trigger an inference that there is no significant likelihood of removal; they "simply show[] that the bureaucratic gears . . . are slowly grinding away." *Khan*, 194 F. Supp. 2d at 1137; *see also Fahim*, 227 F. Supp. 2d at 1367 (explaining that "mere delay" is insufficient to warrant "an inference that a deportable alien will never be accepted by his native country"). Moreover, the record does not reveal any seemingly insurmountable impediments to Ahmed's removal, and the government has assured this Court that it is not aware of any at the present time.[5] *Khan*, 194 F. Supp. 2d at 1136–37

---

[5]   In his submissions to the Court, which include a statement from his former immigration attorney, Ahmed suggests that his continued detention is unreasonable because he "should not have been ordered removed in the first place," because "he should not have been forced to wait more than six months for the immigration court to issue its decision," and because the current length of his detention has "taken a toll on [his] emotional and physical health." (Doc. No. 9 at 2; Doc. No. 10 at 4.) This Court, however, does not have jurisdiction to review the propriety or correctness of Ahmed's removal order. *See Tostado v. Carlson*, 481 F.3d 1012, 1014 (8th Cir. 2007) (explaining that district courts have no "habeas jurisdiction to review final orders of [removal]" because "a petition for review to the courts of appeal is the exclusive means of review of an administrative order of removal, deportation, or exclusion") (citing 8 U.S.C.

(Footnote Continued on Next Page)

11

(rejecting a *Zadvydas* claim where there were no institutional or individual barriers to removal, and "[p]rogress, however slow, [was] being made").

Because the record currently does not establish that there is no significant likelihood of removal in the reasonably foreseeable future, Ahmed is not entitled to immediate release from detention under *Zadvydas*. Nevertheless, since circumstances may change, and because "what counts as the 'reasonably foreseeable future'" necessarily shrinks "as the period of prior postremoval confinement grows," this Court recommends that Ahmed's petition be denied without prejudice. *See Mehighlovesky*, 2012 WL 6878901, at *6 (recommending dismissal without prejudice); *Jaiteh*, 2008 WL 2097592, at *3 (same). If the government continues to detain Ahmed without making further progress towards his removal, Ahmed may renew his *Zadvydas* claim sometime in the future by filing a new petition for a writ of habeas corpus.

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Ahmed's petition for a writ of habeas corpus (Doc. No. 1) be **DENIED WITHOUT PREJUDICE**.

---

(Footnote Continued from Previous Page)
§ 1252(a)(5)). And neither Ahmed's physical or emotional condition, nor the length of time it took the IJ to issue the removal order, has any bearing on whether there is a "significant likelihood of removal in the reasonably foreseeable future." *See Zadvydas*, 533 U.S. at 701.

Date: March 17, 2015

*s/ Becky R. Thorson*
BECKY R. THORSON
United States Magistrate Judge

**NOTICE**

Under D. Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **March 31, 2015**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within **fourteen days** after service thereof. All briefs filed under this rule shall be limited to 3,500 words. A district judge shall make a de novo determination of those portions of the Report to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Eighth Circuit Court of Appeals.